Ray RAMBO, Appellant,

v.

FEDERATED DEPARTMENT STORES, INC., Appellee.

No. 15518.

Court of Civil Appeals of Texas.

Dallas.

Oct. 16, 1959.

Rehearing Denied Nov. 13, 1959.

Emil Corenbleth and Harold B. Berman, Dallas, for appellant.

Johnson, Bromberg, Leeds & Riggs, Otis B. Gary and William D. Powell, Dallas, for appellee.

DIXON, Chief Justice.

Appellant Ray Rambo brought this suit against appellee Federated Department Stores, Inc. for damages in the amount of $27,500 for alleged wrongful interference with an alleged oral broker's contract between Rambo and Interstate Circuit, Inc. for the sale of real estate owned by Interstate Circuit, Inc.

At the trial of the cause, after appellant as plaintiff had rested his case, the trial court sustained appellee's motion for an instructed verdict and entered judgment in behalf of appellee that appellant take nothing.

Federated Department Stores, Inc. appellee with headquarters in Cincinnati, Ohio, owns department stores in various cities including Dallas, Texas. Its Dallas subsidiary at all times pertinent hereto was operated under the name of Sanger Brothers.

Interstate Circuit, Inc. of Dallas, Texas, at all times pertinent hereto was a subsidiary of American Broadcasting-Paramount Theatres, Inc. of New York, New York.

Though they have prominent parts in this controversy, Sanger Brothers, Interstate Circuit, Inc. and American Broadcasting Paramount Theatres, Inc. are not parties to this suit. The only parties are appellant Ray Rambo, who was plaintiff in the trial court, and appellee Federated Department Stores, Inc. who was defendant in the trial court.

In his first point on appeal appellant asserts in substance that the court erred in directing a verdict and denying him the right of trial by jury in that the evidence presented by appellant was of probative force in support of the cause of action alleged by him. In a second point appellant contends that the court erred in excluding evidence as to the usual and customary commission rates as set by the Dallas Real Estate Board during the year 1954. The first point requires a careful examination of both the pleadings and the evidence.

## Pleadings.

In his petition appellant, a real estate broker, alleges that in the month of September 1954 he entered into an oral agreement, which was reconfirmed and reaffirmed in January, February and March, 1956, to the effect that he would act as broker for Interstate Circuit, Inc. to sell a block of property belonging to the said Interstate Circuit, Inc. in Dallas County, Texas; that if a sale of the property should be consummated to a purchaser to whom appellant had shown the property, Interstate Circuit, Inc. would pay appellant a real estate commission in the amount of 5% on the first $300,000 of the purchase price and 2½% on all sums above said amount; that appellant thereafter presented and showed said real property to appellee Federated Department Stores for the first time during the month of October 1954 and again on several other occasions; that later appellee, dealing directly with Interstate Circuit, Inc. bought the property for $800,000 cash and fraudulently and intentionally represented and warranted to said Interstate Circuit, Inc. that appellee had not been presented said

property by appellant and that appellee had not negotiated for said property with any broker; that Interstate Circuit, Inc. refused to pay appellant his commission as a result of appellee's purposeful and fraudulent interference with the oral contract between appellant and Interstate Circuit, Inc. to appellant's damage in the amount of $27,500.

## Evidence.

Appellant Rambo's Testimony: In his own behalf appellant testified that in August or September 1954 he went to see Mr. John Quincy Adams, who he understood was the man in charge of Interstate's property. He told Adams that he had two or three clients interested in the property owned by Interstate Circuit, Inc. in Preston Center. He asked Adams if he would pay a commission if a lease or sale were made to a prospect to whom he, appellant, had shown the property. According to appellant, Adams said he would pay the regular commission. Appellant, himself, testified that the commission recommended by the Dallas Real Estate Board is 5% of the first $300,000 of the purchase price and 2½% of all amounts above said $300,000. Adams did not name any figure as the price at which Interstate Circuit, Inc. would be willing to sell the property.

Appellant further testified that he thereafter contacted Sanger Bros. four times with reference to the purchase or lease of the property in question as a site for a suburban department store. The first two contacts were in October 1954; the third was in November 1954; the fourth was in May or June 1955. At the time of the first two contacts part of the property owned by Interstate Circuit, Inc. was zoned for business and part for apartments. Later it was all zoned for business.

His first contact with Sanger Bros., according to appellant, was through S. T. Chandler. Appellant left a plat of the property with Chandler, who said he would discuss the matter later with Salzberger, president of Sanger Bros.

Appellant's second contact was a week or ten days later. Chandler told him that they had still not decided about the matter, that he, Chandler, had not yet talked to Salzberger, and that he would write a letter to appellant as soon as he had a meeting with Salzberger. On October 29, 1954, Chandler addressed a letter to appellant, the material part of which was as follows: " * * * Thank you for bringing to our attention a piece of property in Preston Center. I brought the proposed project to the attention of the President of our Store and his reaction was that we were not far enough along with any of our plans, in the development of branch stores, to be interested in any one piece of property. We are glad to have this information, however, and appreciate your thinking of our organization."

At the third contact, in November 1954, he called Chandler and asked him if Sanger Bros. would be interested in a land lease of the property. Chandler said they might. No terms were discussed.

On May 6, 1955 appellant and H. B. Worthy wrote a letter to Interstate Circuit, Inc., owners of the property, which letter they both signed as "Cooperating Brokers." We quote part of this letter: " * * * In regard to the above captioned property owned by Interstate Circuit, Inc., about which we have talked several times prior to your obtaining the change in retail zoning on the Douglas portion, we will appreciate an opportunity to obtain lessees for all or any part of said property which you may elect to lease or sell.

"Should this meet with desired approval, we are ready and willing to start toward that objective now on a tentative basis or as soon as your Master Plan on the proposed development is completed and available to us.

"We have, at this time, a very interested prospect for ground leasing, leasing or purchasing a site (with or without improvements) for a modern service station with improvements alone costing $45,000.00 to $50,000.00, * * *."

At the fourth contact with Sanger Bros. which was in May or June, 1955, appellant informed Chandler that the property had recently been rezoned so that all of it was zoned for business. Appellant again asked Chandler if Sanger Bros. would be interested in a lease on the land so that they could construct their own building or have one constructed. Chandler said they might.

Appellant also testified that in June 1955 Federated Department Stores, Inc., through its vice-president and real estate manager, M. M. Briggs, became interested in property in Preston Center owned by Sam Lobello. Federated Department Stores, Inc. desired to buy the Lobello property as a site for a store to be operated by its subsidiary, Sanger Bros. Appellant, whose real estate office was located in property owned by Lobello, was representing Lobello for the purpose of buying the leases of Lobello's tenants so that the sale of the Lobello's property to Federated Department Stores, Inc. could be consummated. Appellant, Lobello, Briggs and Chandler went to Waco where Youngblood, one of the tenants lived. No agreement could be reached with Youngblood for the surrender of his lease. As a result the sale of Lobello's property could not be consummated. During these negotiations appellant said nothing to Lobello, Briggs, or Chandler about representing Interstate Circuit, Inc. as a real estate broker.

S. T. Chandler's Testimony: Chandler was vice-president of Sanger Bros. in charge of operation and finance. Sanger Bros. first became interested in the Interstate Circuit, Inc. property in 1953. A written survey was prepared by Mr. Gerstenberg of Federated Department Stores, Inc. and was available in May of 1954. This survey showed plats of possible sites in Dallas, in Wynnewood and in Preston Center, including the property owned by Lobello and Interstate Circuit, Inc. Rambo came to see Chandler in October 1954 and called his attention to the property of Interstate Circuit, Inc. Appellant said he worked with J. Q. Adams of Interstate

Circuit, Inc. He left a plat of the property which Chandler later returned. Chandler told appellant he would bring the matter to the attention of Salzberger, president of Sanger Bros. Chandler wrote the letter of October 29, 1954 to appellant hereinbefore quoted. He did not report this conference to Federated Department Stores, Inc. in Cincinnati, because he already knew of the property from the Gerstenberg survey and also from personal knowledge of the site. In 1955 M. M. Briggs came to Dallas from Cincinnati. Chandler saw appellant again during the Lobello negotiations but nothing was said about the Interstate Circuit, Inc. property. Meantime Briggs had contacted Adams of Interstate Circuit, Inc.

On July 12, 1955 Saltzberger received an unsolicited letter from Adams of Interstate Circuit, Inc. We quote material parts of this letter: " * * * Our property at Douglas, Berkshire and Anthony Plaza, Dallas, has never been put on the market, either for sale or lease. It is true that during the years I have been approached by many real estate men and always I have told them the same thing, to-wit—that the property was not for sale or lease, but that if they had any offer to submit, we would be glad to look at it.

"The earliest and first contact I had with your company came from your Mr. M. M. Briggs, who called on me this spring, 1955. We had a short but pleasant visit and I lent him an aerial photo of the property, which he subsequently returned. Within recent weeks you and I have had two meetings, without benefit of any assistance from any real estate agent. * * * Then on July 5th a Mr. Rambeau called me and stated that he understood you and we were on a deal and that he had had some correspondence with you. He stated that if we made a deal, he was confident he was entitled to some commission. I don't even know this man, although it is conceivable that at some time he might have called me on the phone and if he did, I am sure I gave him my 'stock reply'.

"I felt, first, that you ought to have the foregoing information, and second, I wanted to say that if you and we should ever make a deal on this property, we would not expect to pay a commission to anyone.

"I am very confident that when your Mr. Briggs originally called on me, any deal which we might make was then initiated and that no real estate man has yet placed any part whatever between us."

On July 21, 1955 Chandler replied to the above letter: " * * * Before Mr. Salzberger left on vacation he asked me to answer your letter of July 12th regarding the property at Douglas, Berkshire and Anthony Plaza. In order that we all understand about the realtor, Mr. Rambo, claiming to be involved in this property, we will set forth our knowledge and experience.

"1. Of course Mr. M. M. Briggs represents Federated.

"2. Mr. Majors was authorized by Sanger Bros. to discuss this property with your company as an agent of Federated and Sanger Bros.

"3. A realtor, by the name of Roy T. Rambo, approached me some time in October, 1954, stating that he worked with Mr. Adams and Interstate on different real estate deals, and wanted to know if we were interested in the above piece of property. If so, he would discuss the property with Mr. Adams and let us hear from him.

"We, of course, have had hundreds of pieces of property brought to our attention all over the city in the last few years. I mentioned this piece of property at the time to Mr. Salzberger, after Mr. Rambo's visit. We of course already had prior knowledge of who owned the property.

"Mr. Salzberger advised at the time, that we were not far enough along with any definite branch plans to be interested in any one definite piece of property, and as a matter of courtesy, on Oct. 29th, I so advised Mr. Roy T. Rambo by letter to that effect, thanking him for the information and interest in our store.

"Mr. Rambo later contacted us about another piece of property in the Preston area, out around Royal Lane, and we advised him also that we were not interested in the property. Some time after Mr. Rambo's second visit, he brought up the subject of your property and again Mr. Rambo was advised that we were not in a position to discuss any one piece of property, and also that our company had a Real Estate Department that handled the acquisition of property that Federated was interested in, usually direct with the owner or an agent specified by the owner, and we as local people only consult with our Real Estate Department on the acquisition of property.

"It seems that Mr. Rambo is trying to inject himself in this situation merely because he came to my office and advised that if we were interested in this property he would discuss it with you as he did work for Interstate Circuit, Inc.

"Mr. Rambo has also called Mr. Salzberger and advised him he thought he should be considered in the transaction because he brought the property to our attention, which of course, is not correct."

On July 25, 1955 Chandler wrote to Briggs at Cincinnati informing Briggs that he, Chandler, had talked to Adams of Interstate Circuit, Inc. about appellant and Adams had stated that appellant Rambo was not authorized to represent Interstate in the negotiations then under way in regard to the sale of the property to Federated Department Stores, Inc. With his letter to Briggs he enclosed copies of his letter of October 29, 1954 to appellant, Adams' letter of July 12, 1955 to Salzberger, and Chandler's letter of July 21, 1955 to Adams.

M. M. Briggs' Testimony: At all times involved in this controversy Briggs was real estate manager of appellee Federated Department Stores, Inc. He made trips to Dallas to see about acquiring a site for a suburban store for Sanger Bros. He considered several sites including the Lobello property. In February 1955 he began negotiations with Interstate Circuit, Inc. He

knew nothing about appellant Rambo until he received Chandler's letter of July 25, 1955 enclosing copies of correspondence in regard to appellant. Thereafter he twice contacted Adams to satisfy himself as to appellant's status with reference to the negotiations, and was convinced that appellant was not authorized to represent anybody in the transaction.

Briggs continued his negotiations with Adams of Interstate Circuit, Inc. and later with Messrs. Markley and Goldenson of New York, officers of American Broadcasting-Paramount Pictures, Inc., parent Company of Interstate Circuit, Inc. After considerable negotiations an agreement was reached and on February 15, 1956 a deal was consummated whereby Federated Department Stores, Inc. for the sum of $800,-000 purchased the property of Interstate Circuit, Inc. in Preston Center. In connection with the sale Federated Department Stores executed a warranty that Federated Department Stores, Inc. did not "negotiate for the purchase of the subject property through any broker."

## Opinion.

Appellant in support of the contention raised in his first point on appeal cites the cases of Yarber v. Iglehart, Tex.Civ. App., 264 S.W.2d 474 and Texeramics, Inc. v. United States, 5 Cir., 239 F.2d 762.

In the Yarber case this Court held that if a person with knowledge and fraudulent intent induces a party to breach his contract with another, such person is liable in damages though the breached contract may be unenforceable as between the contracting parties because of the statute of frauds.

■ It is our opinion that our holding in the Yarber case is not applicable to the facts of this case. The evidence introduced in behalf of appellant, if accepted as true, fails to show that he had even an oral contract with Interstate Circuit, Inc. to act as its real estate broker in the sale of the property in question. Appellant pled that Interstate through Adams promised to pay him a commission of 5% on the first $300,000 of the purchase price and 2½% on all sums above $300,000. There is no evidence of any such promise. Appellant testified that Adams promised to pay him the "regular" commission. In seeking to make out a case on that theory he then testified that the Dallas Real Estate Board had set a standard of 5% on the first $300,000 and 2½% on sums above $300,000 as a commission which was recommended for use by real estate brokers and property owners. Appellant did not sue in quantum meruit, nor did he plead custom or practice in the matter of an estate broker's commission. It should be noted also that under appellant's own testimony Adams never did give him a listing price at which Interstate would be willing to sell its property. It seems plain that appellant realized he did not have a listing for in the letter of May 6, 1955 signed by appellant and H. B. Worthy as "Co-operating Brokers" a listing agreement was solicited from Interstate Circuit, Inc. for the lease or sale of Interstate's property. There would have been no need for such a letter if appellant believed that he already had a listing agreement.

■ For another reason we believe appellant cannot prevail. Even if we were to hold that under the evidence appellant had a broker's contract with Interstate, we still could not hold that appellant had made out a case of fraudulent interference; for we find no evidence that Federated Department Stores, Inc. intentionally and fraudulently induced Interstate Circuit, Inc. to breach its contract. The evidence is all the other way. When appellant let it be known to Adams that he would claim a commission if Federated Department Stores, Inc. bought the property in question, Adams for Interstate, at once sent an unsolicited letter to Federated to the effect that appellant did not represent Interstate. Twice thereafter Briggs, real estate manager for Federated Department Stores, Inc., contacted Adams to make sure that appellant still did not represent Interstate. Far from tending to show that Federated was seeking to induce

Interstate to breach a contract with appellant, the evidence tends to show that Federated was seeking information as to whether any such contract in fact existed.

We overrule appellant's first point on appeal.

 In his second point appellant complains of the rejection of evidence as to the usual and customary commission rates as set by the Dallas Real Estate Board. As we have already pointed out appellant pled a specific agreement as to the commission he alleged was to be paid to him. He did not plead custom or general practice. He did not plead quantum meruit. He does not say that he ever brought an offer of purchase to Interstate Circuit, Inc. We see no error in rejecting the proffered testimony. Appellant's second point is overruled.

The judgment of the trial court is affirmed.